610 So.2d 38 (1992)
STATE of Florida, Appellant,
v.
Solomon HARDY, Appellee.
No. 92-541.
District Court of Appeal of Florida, Fifth District.
December 4, 1992.
Robert A. Butterworth, Atty. Gen., Tallahassee, and David G. Mersch, Asst. Atty. Gen., Daytona Beach, for appellant.
James B. Gibson, Public Defender and Kenneth Witts, Asst. Public Defender, Daytona Beach, for appellee.
GOSHORN, Chief Judge.
The State of Florida appeals from the trial court's order suppressing evidence seized from an automobile driven by Solomon Hardy. We affirm.
During the hearing on Hardy's motion to suppress, Officer Anthony Esoff of the Sanford Police Department testified that on May 1, 1991, he stopped Hardy for *39 speeding at approximately 4:00 AM. Officer Esoff ran a license check on Hardy and gave Hardy a verbal warning about speeding, but wrote a citation against Hardy for failing to produce proof of insurance. Officer Esoff asked Hardy to step out of the car to sign the citation.
At about this time, Officer Daryl Brewer arrived at the scene and began conducting a safety search of the car with a flashlight by looking through the windows and the windshield. In the meantime, Hardy signed the citation and Officer Esoff explained to Hardy how to correct the insurance problem. Officer Esoff told Hardy that he had noticed a suspicious looking gym bag on the floorboard and asked Hardy if he could search the car. After being told that the search was voluntary and that he could say no, Hardy said that he did not want his car searched.
At that point, Officer Brewer pulled Officer Esoff aside and told him that a knife in a sheath appeared to be on the floorboard between the driver's seat and the driver's door. At the suppression hearing, Officer Brewer testified:
A. While Officer Esoff was writing the ticket, I was standing off to the side on the grass to the right of the vehicles just keeping an eye on Mr. Hardy who was a loan [sic] passenger in the vehicle.
After he was requested to get out and go to the back of his car by Officer Esoff. I proceeded to walk around his car shining my light inside the interior looking for any weapons for officer's safety.
Q. Sure.
A. After I got around to the driver's side, I shined my light through the windshield illuminating the area of the floorboard underneath the front seat and then along between where I could see partially between the driver's seat and driver's door.
Q. Was the door to the car at this point open or closed?
A. It was closed.
Q. All right. What did you see?
A. I saw what appeared to be the handle of a large hunting-type knife lying on the floor between the seat and the door.
Q. Okay. What, if anything, did you do at that point?
A. After continuing on looking on around through there, I went back and had Officer Esoff step aside from Mr. Hardy and informed him of what I had seen.
Q. Did you at any time open the door?
A. No.
Q. Did you at any time move that knife and put it in someplace where you could see it?
A. No, sir.
Officer Esoff similarly testified:
About that time Officer Brewer was walking back towards my car towards us, and he, you know, told me to come to the side, and he had told me that he had  a knife in a sheath appeared to be laying on the floorboard between the driver's seat and the driver's door partially under the door.
Q. Did you go and look at it?
A. Yes, I did.
Q. Explain to the Court exactly where it was in the car in relation to seats and floorboards and doors.
A. We were looking through the front windshield with the aid of a flashlight, and looking through the front windshield you could see the handle, the knife handle, lying on the floorboard. The sheath part was partially underneath the seat. That's the best I can describe it.
Officer Esoff then arrested Hardy for carrying a concealed weapon. Pursuant to the arrest, Officer Esoff searched Hardy's car and found a loaded sawed-off shotgun with shells in the gym bag.
After the suppression hearing, the trial court entered a written order granting Hardy's motion to suppress. In the order, the trial court found:
In this case the knife was visible for anyone to see who looked for it. It was, therefore, not concealed. Since the defendant committed no crime, the search of the vehicle incidental to his arrest was unauthorized and the short barreled shotgun seized during the search is not admissible in evidence.
*40 The trial court then suppressed the shotgun as evidence.
We begin our analysis with the leading Florida Supreme Court case of Ensor v. State, 403 So.2d 349 (Fla. 1981). In Ensor, the undisputed facts are that following a traffic stop and in accordance with normal police procedure, one officer peered through the front windshield of Ensor's car and spotted a portion of a white object protruding from under the left side of the passenger floormat. The officer was unable to identify the object until he squatted and looked through the already-opened passenger door. At that point, the officer determined the object was a derringer pistol, which he seized.
In its opinion, the Ensor court considered section 790.001(2), Florida Statutes, which defines a concealed firearm as "any firearm ... carried on or about a person in such a manner as to conceal the firearm from the ordinary sight of another person."[1]Id. at 353. The court explained:
The term "ordinary sight of another person" means the casual and ordinary observation of another in the normal associations of life. Ordinary observation by a person other than a police officer does not generally include the floorboard of a vehicle, whether or not the weapon is wholly or partially visible.
These statements are not intended as absolute standards. Their purpose is to make it clear that a weapon's possible visibility from a point outside the vehicle may not, as a matter of law, preclude the weapon from being a concealed weapon under section 790.001... . In all instances, common sense must prevail. The critical question turns on whether an individual, standing near a person with a firearm or beside a vehicle in which a person with a firearm is seated, may by ordinary observation know the questioned object to be a firearm. The ultimate decision must rest upon the trier of fact under the circumstances of each case.
Id. at 354-55 (emphasis added). Under the facts in Ensor, the court ultimately held that the firearm was wrongfully suppressed.
The Second District Court of Appeal also addressed the issue of concealment in Gibson v. State, 576 So.2d 899 (Fla. 2d DCA 1991). In Gibson, a police officer stopped a vehicle for a traffic violation. After approaching the vehicle, the officer shined his flashlight into the vehicle's interior and detected the handle of a large knife on the floorboard. Based on the officer's testimony, the court held that the knife was not concealed because the officer knew that the object, a machete, was a large knife when he saw it on the floorboard. The Second District then reversed the trial court's order denying Gibson's motion to suppress.
Thus, given a different set of facts, the Gibson court came to a different result from the Ensor court. The Gibson court relied on this court's opinion in Cope v. State, 523 So.2d 1270 (Fla. 5th DCA), review denied, 531 So.2d 1355 (Fla. 1988). In Cope, two police officers stopped a truck for a traffic infraction. One officer, who had shined his flashlight into the cab of the truck, testified during a hearing that he saw in plain view on the front seat the butt of a weapon that he immediately recognized as a handgun. The court held that unlike the officer in Ensor, the officer in Cope instantly recognized a blue steel pistol with wood-grain handle grips upon a "casual observation," and thus, the pistol was not "concealed" under the ordinary meaning of that word. See also Mitchell v. State, 494 So.2d 498, 500 (Fla. 2d DCA 1986) (holding that the firearm, which was behind the driver's seat with the butt extending up about six inches past the seat and the barrel pointing straight down to the floorboard, was not concealed or hidden from the ordinary sight of the average person because the officer "recognized the butt of the carbine as a part of a firearm *41 without changing his position or bending down to look under a car seat to find it").
Similarly, in the instant case, both officers testified that upon peering through the windshield, the object was clearly visible and that they readily identified the object as a knife in a sheath. Based upon this testimony, the trial judge found the knife was visible for anyone to see. A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the appellate court must interpret the evidence and the reasonable inferences derived from the evidence in the light most favorable to the trial court. State v. Rizo, 463 So.2d 1165, 1167 (Fla. 3d DCA 1984). In this case, the record supports the trial court's finding that the knife was not concealed because the officers' testimony clearly shows that from a position outside the vehicle and without squatting or bending down they immediately recognized a knife and sheath between the driver's seat and the door.
AFFIRMED.
DAUKSCH, J., concurs.
HARRIS, J., dissents with opinion.
HARRIS, Judge, dissenting.
I respectfully dissent.
Solomon Hardy was stopped at 4:00 a.m. for a traffic infraction. After receiving a warning for speeding and a ticket for failure to have proof of insurance, Hardy was told that he was free to leave. As he was about to leave, a second officer who had been looking into the vehicle from the outside advised that he had seen a concealed weapon (a hunting knife) hidden partially under the seat and running parallel to the hump between the seat and the driver's door. Hardy was arrested for that offense and a further search of his vehicle revealed a loaded sawed off shotgun in a gym bag laying on the floor.
The trial court suppressed the evidence of the weapons because "the knife was visible for anyone to see who looked for it." [Emphasis added]. Since I conclude that the trial court applied the wrong standard, I would reverse.
I agree with Judge Eaton, however, that the trial courts have received poor guidance from the appellate courts on how to apply the concealed weapon laws. Certainly this opinion is no exception. I also agree with him that Ensor v. State, 403 So.2d 349 (Fla. 1981) is the controlling case. I disagree, however, that the Ensor dissent is the law to be followed. The Ensor majority seems to clear up (at least to some extent) the conflicting decisions of the various appellate courts. The facts in Ensor are substantially the same as in this case. A police officer, during a traffic stop, shined his light through the windshield and saw an object partially sticking out from under the seat. Kneeling down and looking under the seat from the already opened door, he was able to verify that it was a firearm. This search was upheld.
The supreme court in Ensor gave us this guidance:
The term "ordinary sight of another person" means the casual and ordinary observation of another in the normal associations of life. Ordinary observation by a person other than a police officer does not generally include the floorboard of a vehicle, whether or not the weapon is wholly or partially visible.
* * * * * *
It should be emphasized that the permissible and legal observations of a police officer in making an arrest and the observation of an average person making normal contact with an individual are clearly not the same.
The testimony of the officer in the present case is that in order to see the knife "we were leaning over on the driver's side in front of the driver's door looking through the front windshield [to the area of the floor next to the driver's door and between the hump and the seat]. As in Ensor, I would find that this was not an ordinary "observation of an average person making normal contact with an individual." Whether the weapon was concealed is a fact question to be decided by the jury.
*42 I believe the majority position is in conflict with Ensor and I dissent.
NOTES
[1] In the instant case, the State relies on the statutory definition of a concealed weapon pursuant to section 790.001(3)(a), Florida Statutes (1991). The two sections contain identical operative language.